**AST/SERVO SYSTEMS, INC.**

**v.**

**The UNITED STATES.**

**No. 221–70.**

United States Court of Claims.

Oct. 15, 1971.

Harold C. Petrowitz, Washington, D. C., attorney of record, for plaintiff.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

DAVIS, Judge.

In 1968 and 1969 the Air Force sold as surplus Government material, at public advertised sales, a number of Guidance Sets of the Atlas Intercontinental Ballistic Missile. There were no restrictions on use or resale. Two of the original purchasers resold 34 of these sets to the plaintiff—27 at $75 apiece and 7 at $300 each.[1] Plaintiff then offered the items for sale, in its catalogue, at a unit price of $3,895. Alerted to this advertisement, the Air Force wrote plaintiff that the units "have been determined to be instruments and appliances relating to the national defense" under 18 U.S.C. § 793,[2] and demanding immediate deliv-

---

1. The original vendors had paid the Air Force a unit price of about $180 (average) for the 27, and $405 each for the 7.

2. 18 U.S.C. § 793(d) and (e), a part of the Espionage. Act, read as follows:

"(d) Whoever, lawfully having possession of, access to, control over, or

ery of the appliances to the United States in accordance with that provision. The Air Force shortly took all 34 sets from plaintiff, which did not protest or resist the recapture, but did, some time later, ask the Government to return the equipment or to purchase it from plaintiff for $92,718. When the Air Force refused, this suit was brought for "just compensation in the amount of $132,430.00 [$3895×34] plus interest." There is common agreement on the relevant facts, and the matter comes to us on cross-motions for summary judgment.

■ We decide the case (without independently delving into the assumptions) on three basic postulates accepted and put forward by both sides: first, the goods were "instruments" or "appliances" "relating to the national defense" within 18 U.S.C. § 793(d) and (e), *supra*, note 2; second, at the times of the initial sale by the Air Force and of the resale to plaintiff, none of the items was classified in any way; and, third, the Government had the right under 18 U.S.C. § 793 to repossess the Guidance Sets from plaintiff. The single issue we are asked to resolve, on these premises, is the amount of compensation due plaintiff from the Government for the equipment. The defendant is willing to pay the plaintiff's out-of-pocket costs, while the latter demands fair market value. The Espionage Act does not explicitly direct any measure of recovery.

The path would be easy and direct were it not that the case, as presented, assumes both that the Guidance Sets related to national defense (in the sense of the Espionage Act) and also that they were unclassified when and after they were sold by the Air Force. In Dubin v. United States, 289 F.2d 651, 153 Ct.Cl. 550 (1961), and 363 F.2d 938, 176 Ct. Cl. 702 (1966), cert. denied, 386 U.S. 956, 87 S.Ct. 1019, 18 L.Ed.2d 103 (1967), the whole court ruled that the purchaser of retrieved surplus equipment was entitled, under the Act, only to actual expenditures where the items related to national defense and were also classified at the time of sale. Conversely, it is clear that unclassified goods which are unconnected with the national defense fall entirely outside of the Espionage Act; if the Government seizes them it should pay their value in a tort suit for conversion or an action for just compensation.

Here, under the parties' joint assumptions, we have, instead of these pure models, a mixed situation—items which are unclassified but still related to the

being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it; or

"(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, sig-

nal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it; or"

These provisions were extensively discussed, in another context, in some of the opinions in New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

national defense, and which the Government has the right to recapture under the Act. Because plaintiff makes the latter concession we do not now have to consider whether unclassified items are in fact subject to the statute.[3] Nor, on this record, is there warrant for holding, as defendant suggests, that the Air Force made a mistake, that the material should properly have been classified, and that it should now be treated as such. There is simply no proof in the papers before us that any regulation or directive required classification, or that an error was made in failing to classify or in declassifying before sale. The defendant argues that Defense Department and Air Force manuals[4] called for demilitarization of the equipment through destruction of the gyroscopes and other electronic components, but demilitarization and classification are separate functions (though often overlapping) and a command to demilitarize is not equivalent to a declaration that the item should be or remain classified if not demilitarized. We think, therefore, that we must consider these Guidance Sets as unclassified (though related to national defense and subject to repossession under the Espionage Act).

Even so, the defendant says, the instructions for demilitarization in the military manuals were mandatory on the Government's selling agents, and the latter's omission to adhere to those directives invalidated the sale. The pertinent portions of the manuals are indeed mandatory in terms—requiring the removal or destruction of at least all gyroscopes and accelerometers[5]—but plaintiff argues that in practice the prescriptions

have been construed as discretionary. Whether or not this is so, the spare record presented to us indicates that no such discretion was exercised or invoked by the Air Force when it sold the Guidance Sets, in the sense that no one consciously decided that demilitarization was unnecessary. The defendant's documentation refers to the failure to demilitarize as an "administrative error", which we take to be a simple oversight, and plaintiff does not counter with anything suggesting otherwise.[6] Even if some discretion had been granted, this total failure to advert to the problem was a violation of the binding instructions.

The next step is to decide whether the demilitarization directives circumscribed the authority of the Air Force's representatives so that the sale, which overlooked these requirements, was *ultra vires* for that reason. In this, though perhaps there is room for another view, we agree with the Government. It is clear from the manuals that the Defense Department was intent on withholding certain types of military equipment from falling into the hands of foreign powers or others who might make use of them contrary to this country's interests. This is an important objective and one which is quite consonant with, and close to, the aims of the Espionage Act, *supra*, note 2, which goes so far as to sanction recapture. Because of the nature and impact of this policy, we think that both Congress and the military would be wary of any lapses and disturbed at a breach of the requirements. It is therefore appropriate to construe the manual's directives for de-

3. In *Dubin II, supra*, 363 F.2d at 943, 176 Ct.Cl. at 711, the present writer questioned whether subdivision (e) of the Act applied at all to unclassified equipment.

4. DOD Disposal Manual, AFM 67–4, and USAF Supply Manual, AFM 67–1.

5. The petition alleges that these gyroscopes and accelerometers represented "most of the market value of the seized Guidance Sets."

6. The petition alleges that "[a]s far as can be ascertained, the reason for seizure under 18 U.S.C. § 793 was a determination by the Foreign Technology Section of the Air Force Systems Command that three gyroscopes and three accelerometers contained within each of the Guidance Sets should not be allowed to come into the possession of governments unfriendly to the United States", and the implication is left that this matter was first considered after the sale and resale, and at the time plaintiff advertised.

militarization as cutting into the authority of the Air Force's selling agents, and not merely as an internal admonition how to act within their authority. *Cf.* Schoenbrod v. United States, 410 F.2d 400, 187 Ct.Cl. 627 (1969); Prestex Inc. v. United States, 320 F.2d 367, 162 Ct. Cl. 620 (1963); New York Mail & Newspaper Transp. Co. v. United States, 154 F. Supp. 271, 139 Ct.Cl. 751, cert. denied, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957).

■ That the Defense Department's directives were left out of the Federal Register does not alter this conclusion. It would probably be better if material of this kind were printed in that journal, but there was in fact publication in manual form, and the pamphlets were available to the public. It is not an ironclad rule that limitations on contractual authority must be specified in the Register. *Cf.* Carrier Corp. v. United States, 328 F.2d 328, 164 Ct.Cl. 666 (1964). Nor is the result changed by the fact that plaintiff did not buy directly from the Government but from the Government's vendee. There is no doubt that plaintiff knew at all times that the equipment came originally from the Government; it was buying items which obviously had come from the military, not fungible goods which could well have stemmed from a private source. In these circumstances, there is no justification for treating plaintiff as a wholly "innocent purchaser for value" or for disregarding the invalidity of the initial sale by the Air Force.

In Turney v. United States, 115 F. Supp. 457, 463, 126 Ct.Cl. 202, 213–214 (1953), the court held a comparable directive (in that instance the limitation was that "under *no* condition will any radar equipment be declared to the disposal agency") not to affect the validity of the sale by the Government. But, answering a like contention based on *Turney,* the first *Dubin* opinion, 289 F.2d at 654, 153 Ct.Cl. at 554–556, pointed out that the earlier decision did not involve the provisions of the Espionage Act which were relevant in *Dubin* and here.

*Dubin* is conclusive on this point; the Espionage Act is the catalyst which changes the rule.

For these reasons, and on the assumption that 18 U.S.C. §§ 793(d) and (e) cover these Guidance Sets, we hold that the Air Force's original sale was invalid for failure to demilitarize, and that plaintiff is bound by the vice in that transaction. In this posture, the measure of recovery is that conceded by the defendant—plaintiff's out-of-pocket expense. Since plaintiff's right to the equipment was defective from the beginning, it cannot have just compensation or fair market value. But as in the comparable case of *Dubin* "[i]f the possessor who has no right to keep possession of the property has come into its possession as a result of a mistake by Government officials in selling the property * * *, he has an urgent equity in the direction of getting a refund of his direct out-of-pocket expenditures in the abortive transaction." 289 F.2d at 655, 153 Ct.Cl. at 556. See, also, 363 F.2d at 943, 176 Ct.Cl. at 710–711. This is the usual practice for invalid or vulnerable government sales-transactions which are aborted. *Cf.* Hexagon Laboratories, Inc. v. United States, 174 Ct. Cl. 1267, cert. denied, 384 U.S. 951, 86 S.Ct. 1571, 16 L.Ed.2d 548 (1966); Freedman v. United States, 320 F.2d 359, 362–363, 162 Ct.Cl. 390, 396–397 (1963); Benjamin v. United States, 348 F.2d 502, 516, 520, 172 Ct.Cl. 118, 137– 138, 143–144 (1965). The rule also harmonizes, in its rejection of expected profits, with the normal quantum meruit measure of recovery on invalid agreements under which the Government, as purchaser, receives benefits. *Cf.* Prestex Inc. v. United States, *supra,* 320 F. 2d at 373, 162 Ct.Cl. at 628–629.

The plaintiff is entitled to recover only its actual out-of-pocket costs. Except to that extent, the defendant's motion for summary judgment is granted and the plaintiff's is denied. The amount of recovery will be determined under Rule 131(c).